| | | |
|---|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**SOUTHERN DISTRICT OF NEW YORK** | | **NOT FOR PUBLICATION** |

---------------------------------------------------------------
                                                                                        :

In re                                                   :                    Chapter 11
                                                        :

CPW ACQUISITION CORP. and       :          Case No. 08-14623 (AJG)
ROBERT LANE ESTATES, INC.        :

                                                       :          (Jointly Administered)
                                    Debtors.     :
---------------------------------------------------------------

## OPINION REGARDING CPW'S MOTION OBJECTING TO COMPENSATION AND REIMBURSEMENT OF EXPENSES PAID TO DEWEY & LEBOUEF LLP AND ARNOLD & PORTER LLP AS COUNSEL TO FORTRESS CREDIT CORP.

**A P P E A R A N C E S:**

ROSEN & ASSOCIATES, P.C.
Attorneys for CPW Acquisition Corp.
747 Third Avenue
New York, NY 10017

        By:    Sanford P. Rosen, Esq.
                   Jeffrey S. Davis, Esq.

ARNOLD & PORTER LLP
Attorneys for Creditor Fortress Credit Corp.
777 South Figueroa St., 44th Fl.
Los Angeles, CA 90017

        By:    Lisa Hill Fenning, Esq.

      Before this Court is the motion (the "Motion") of CPW Acquisition Corp.

("CPW"), dated August 9, 2010, objecting to compensation and reimbursement of

expenses paid to Dewey & LeBouef, LLP and Arnold & Porter, LLP as counsel to

Fortress Credit Corp. ("Fortress"), and seeking remittance of such fees to the estate.

CPW submits that $301,216.25 of the legal fees, which have been paid out of proceeds from the sale of property in London, England, are objectionable.

## Background and Procedural History

On November 20, 2008, CPW and its affiliate, Robert Lane Estates, Inc. ("Robert Lane" and together with CPW, the "Debtors") each commenced a voluntary chapter 11 case. The Robert Lane case was dismissed by Court order dated November 24, 2009.

On or about October 25, 2005, Jonquille Associated S.A. ("Jonquille" or the "Borrower") entered into a term loan facility agreement (the "Facility Agreement") with Fortress as lender. Under the terms of the Facility Agreement, Fortress also served as security trustee for the benefit of the remaining participating lenders (the "Lenders"). Pursuant to the Facility Agreement, Fortress and the Lenders provided a term loan facility in the amount of €10,500,000 (approximately $12,617,850)[1] and $3,000,000 to Jonquille with a termination date of October 31, 2007. The loan under the Facility Agreement was secured by, *inter alia*, Jonquille's interest in a condominium apartment in London (the "London Property"). By agreement dated December 27, 2006, the parties to the Facility Agreement entered into an Amendment and Restatement Agreement (collectively with the Facility Agreement, the "Loan Agreements") by which the parties to the Facility Agreement redenominated all sums into United States Dollars and increased the commitment under the Facility Agreement to $28,000,000.

On or about October 25, 2005, CPW guaranteed the performance of Jonquille's obligations under the Facility Agreement in the "Guaranty Agreement." At the same

---

[1] The Facility Agreement provides that "any translation from one currency or currency unit to another shall be at the official rate of exchange recognized by the central bank for the conversion of that currency." (Facility Agmt., ¶ 29.9(a)(ii).) The European Central Bank reported the official rate of exchange of €1 on October 25, 2005 to be $1.2017. *Available at* http://www.ecb.int/stats/exchange/eurofxref/html/index.en. html.

2

time, CPW granted a security interest and first lien in all of CPW's assets (the "CPW Mortgage") to secure the payment and performance of CPW's obligations under the Guaranty Agreement. Although the maximum principal amount of indebtedness was limited to $10,000,000 in the CPW Mortgage, CPW and Fortress later entered into a "Mortgage Modification Agreement" under which the maximum principal amount of indebtedness was increased to $14,000,000. Any claim above the $14,000,000 cap would constitute an unsecured claim against the estate.

Jonquille's obligations pursuant to the Loan Agreements were thus secured by (1) Jonquille's interest in the London Property (2) the real property owned and managed by CPW in New York at the Trump International Hotel and Tower Condominium (the "Condominium") to the extent of $14 million, and (3) the real property owned by Robert Lane consisting of a single family residence in California (the "Robert Lane Property").[2] Pursuant to the Loan Agreements, the Borrower was obligated to repay all sums outstanding on October 31, 2007. When the Borrower failed to repay the sums outstanding, Jonquille, CPW, Robert Lane, and Fortress (the "Parties") entered into a letter agreement dated December 10, 2007 (the "First Letter Agreement") that extended the time of repayment subject to Jonquille's payment of $5,000,000 on or before January 31, 2008. The letter provided that the Borrower would indemnify Fortress under the Facility Agreement for all expenses incurred in connection with entering into and implementing the terms of the letter agreement.

---

[2] As additional collateral for the loan, Jonquille pledged certain intercompany debts. Pursuant to an intercompany loan agreement, Jonquille loaned some of the proceeds of the Fortress Loan to the Debtors to pay off the existing mortgages on the Robert Lane and CPW Properties. It is the Court's understanding that the intercompany loan between CPW and Jonquille was not secured. However, Fortress had a security interest in Jonquille's right to receive payment under that loan. Nevertheless, because there were sufficient proceeds in the CPW estate to satisfy all creditors in full, the amount due to Fortress under the Guaranty was fully satisfied and there was no need to collect under the pledged loan receivables.

3

Despite Borrower's failure on January 31, 2008 to prepay at least $5,000,000 of the loans under the Loan Agreements, the Parties entered into a further letter agreement (the "Second Letter Agreement") dated February 29, 2008 providing that Lenders would not make a demand for payment until June 30, 2008 so long as CPW and Jonquille proceeded to the sale of the properties by February 29, 2008. (Second Letter Agmt., ¶ 3.1.2.)[3] The agreement expressly provided that Jonquille and CPW would pay upon demand all reasonable out-of-pocket fees and expenses, including but not limited to legal fees, incurred by or on behalf of Fortress and the other Lenders in connection with implementing the terms of the letter agreement.[4]

On or about April 9, 2008, after neither CPW nor Jonquille proceeded to the sale of the properties, Fortress declared all amounts due and payable and proceeded to enforcement action. Thereafter, on July 9, 2008 the Central London County Court issued a possession order. Fortress, as Security Trustee under a debenture dated December 27, 2006 with Jonquille, as borrower, entered into full possession of the London Property. Fortress closed on the sale of the London Property on July 7, 2009 and applied the sale proceeds of approximately $11.6 million against Jonquille's indebtedness.[5]

---

[3] The Second Letter Agreement also provided that in the event no offer was received on either the London Property or the Condominium by April 30, 2008, Robert Lane would place the Robert Lane Property on the open market as well. (Second Letter Agmt., ¶ 4.1.1.)

[4] Neither the First Letter Agreement nor the Second Letter Agreement altered CPW's rights and obligations under the Guaranty Agreement. The First Letter Agreement delayed the original obligations due by Jonquille under the original Facility Agreement, but did not change any obligations of CPW. The Second Letter Agreement notified the Parties that as a result of the defaults under the Loan Agreements and the First Letter Agreement, all outstanding loans under the Loan Agreements, together with costs and expenses accrued under any of the Loan Agreements, the Guaranty, or the Letters, were payable on demand. Although the Second Letter Agreement provided for certain action on the part of CPW, that action was only due once there was a default under the original Facility Agreement, which then gave Fortress the right to enforce the Guaranty Agreement.

[5] When Fortress closed on the sale of the London Property, Fortress first applied the sale proceeds toward the payment of fees and expenses of the foreclosure, including $1,208,212.26 of attorneys' fees incurred by Fortress incident to the sale, pursuant to § 105 of the Law of Property Act 1925.

4

Fortress also gave notice of a trustee's sale of the Robert Lane Property and commenced an action in the Supreme Court of the State of New York seeking to foreclose on its mortgage lien on the CPW Property. When the Debtors filed their chapter 11 cases, both the sale of the Robert Lane Property and the cause of action against CPW in the Supreme Court of the State of New York were stayed.

On December 4, 2008, Fortress filed a motion before this Court to convert CPW's chapter 11 case to chapter 7 and for relief from the automatic stay in Robert Lane's case to proceed with its foreclosure proceedings. A stipulation (the "Stipulation") was entered into between the Debtors and Fortress and "So Ordered" by the Court on January 27, 2009. The Stipulation provides, *inter alia*, that Fortress is entitled to "an allowed claim in the full amount provided for in the Loan Agreements, including . . . attorneys' fees." (Stip., ¶ 11.) The Stipulation also preserves Debtors' rights to challenge "the calculation of the Post-Petition Amounts or the reasonableness of the requested pre- and post-petition attorneys' fees and costs." (Stip., ¶ 11.)

On August 19, 2009, the Court approved the sale of the Robert Lane Property to FERL LLC. Upon closing, Fortress received the net proceeds and applied those amounts to the outstanding indebtedness under the loan facility. On December 10, 2009, CPW entered into a contract of sale to sell the Condominium to WF NYC Home Trust for a purchase price of $18.5 million, subject to a higher and/or better bid. An auction was held at the sale hearing for the Condominium on January 27, 2010. One Central Park West (NYC) LLC ("One Central Park West") submitted an offer in the amount of $33,177,083, which was considered the highest and best offer. The Court approved the sale to One Central Park West by order dated March 9, 2010.

5

**Jurisdiction**

Fortress contends that the Court lacks jurisdiction over the proceeds from the sale of the London Property because the property was owned by Jonquille. Since the London Property was not property of the estate, Fortress argues, the proceeds of the foreclosure should not be considered property of the estate, either. Fortress also lists several "circumstances" that deprive the court of jurisdiction, including the fact that the challenged time entries relate to services billed in Dewey's London Office on a loan governed by English law to a London-based borrower. Although CPW concedes that the Court lacks jurisdiction over the London Property and its proceeds, CPW maintains that once Fortress filed a claim against the estate, the Court obtained "core" jurisdiction to adjudicate that claim. (CPW Reply, ¶ 6.)

28 U.S.C. § 157(b)(2)(B) confers on the Court "jurisdiction over allowance or disallowance of claims against the estate." When Fortress filed a proof of claim requesting Court approval of the validity and amount of the claim asserted, Fortress called for a determination by the Court as to the appropriate amount of that claim. *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1390 (2d Cir. 1990) ("The determination of the objection to and allowance of [the applicant's] claim is clearly within the traditional core jurisdiction of the bankruptcy court."). *See also In re S.G. Phillips Constructors, Inc.*, 45 F.3d 703, 804 (2d Cir. 1995); *In re Enron Corp.*, 349 B.R. 108, 112 (Bankr. S.D.N.Y. 2006) ("When a creditor files a proof of claim, the bankruptcy court has core jurisdiction to determine that claim, even if it involves a pre-petition contract claim arising under state law.").

6

The fact that the property was owned by Jonquille, a non-debtor, does not negate a finding of jurisdiction. *See In re Peramco Intern, Inc.*, 3 Fed. Appx. 38, 42 (4th Cir. 2001) ("We disagree that the bankruptcy court was without the power to deal with the [p]roperty simply because it was owned by a non-debtor."). Although the fees related to the London Property sale were paid to Fortress, Fortress's receipt merely reduced the amount available to pay on the outstanding loan balance from the sale and increased the amount owed by the Debtors to Fortress under the guarantees. Fortress's claim against the estate consisted of whatever remained of CPW's obligation as Jonquille's guarantor after the net proceeds from the sale of the London Property and those of the Robert Lane Property were applied to Jonquille's indebtedness. Because the Debtor was still obliged to provide for the amount outstanding on the loan, Fortress's remaining claim was borne by the estate. By this motion, the Debtor is seeking for the Court to disallow the amount of attorneys' fees applied regarding the foreclosure of the London Property under the Facility Agreement.

**Applicable Law and Standing**

CPW contends 11 U.S.C. § 506(b)[6] should be the governing standard in this Court's consideration of the Debtor's challenge to the attorneys' fees. Section 506(b) provides, "[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." 11 U.S.C. § 506(b). To prevail under § 506(b), a party must establish: (1) that it has an allowed

---

[6] References to section numbers hereafter will be to Title 11 of the United States Code, unless otherwise specified.

7

secured claim; (2) that it is over-secured; (3) that the documents underlying its claim provide for such fees and costs; and (4) that the claim for fees and costs are reasonable. *In re Salazar*, 82 B.R. 538, 540 (9th Cir. BAP 1987).

A creditor with an allowed secured claim is over-secured if the collateral securing its claim is worth more than the amount of the secured party's claim. A secured creditor only holds "a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and [holds] an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1). Here, Fortress held a lien on the CPW Condominium to the extent of $14 million. Prior to the closing of the Condominium Sale, the remaining unpaid balance of Fortress's claim in the Debtors' cases aggregated $18,796,114.01. Although the Condominium sold for more than $33.2 million, the maximum amount available to secure Fortress' loan was $14 million. Since the amount owed on Fortress's claim, $18,796,114.01, was greater than the value of the collateral that was available to satisfy the secured portion of the claim, $14 million, Fortress was not an over-secured creditor as required by § 506(b).

A claim against the estate for those attorneys' fees, had they been incurred under the Guaranty Agreement, would appear to be an allowed *unsecured* claim. *See Ogle v. Fidelity & Deposit Co. of Maryland*, 586 F.3d 143, 145 (2d Cir. 2009) (interpreting the Supreme Court's opinion in *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.,* 549 U.S. 443 (2007) and finding that "the Code does not prohibit an unsecured creditor from collecting post-petition attorneys' fees pursuant to an otherwise enforceable pre-petition contract of indemnity."). The amounts at issue, however, were not sought

8

under the Guaranty Agreement. The Guaranty Agreement specifically provides that CPW will reimburse Fortress "to the extent such reimbursement is not made by the Borrower for all expenses, including, without limitation reasonable counsel fees and disbursements, incurred by Lender in connection with the collection of the Guaranteed Obligations or any portion thereof." (Guaranty Agmt., § 7.)[7] Fortress's enforcement costs with respect to the foreclosure of the London Property were paid out of the proceeds of that property pursuant to English law and the Facility Agreement. No claim for those attorneys' fees was then made against CPW for the costs of foreclosure under either the Guaranty Agreement or the pledged intercompany receivables. Although the fees at issue have an indirect impact on the claim under the Guaranty Agreement, the fees were incurred in satisfaction of the Borrower's obligation under the Facility Agreement, not the Debtor's obligation under the Guaranty Agreement. While the Court has jurisdiction over Fortress's deficiency claim against the estate,[8] § 506(b) does not apply

---

[7] "Guaranteed Obligations" is defined as, *inter alia,* the indebtedness of all sums and charges under the Loan Documents. (Guaranty Agmt., § 3.) CPW also covenanted that it would be liable to Fortress for the payment in full of the Loan Agreements and all other charges that would be due under that agreement. (Guaranty Agmt., §§ 2-3.) This includes any and all enforcement costs incurred by Jonquille "in connection with the enforcement of, or the preservation of any rights under, any Finance Document." (Facility Agmt., ¶ 17.3.)

[8] The fact that Fortress did not make an independent claim against the estate for attorneys' fees under the Guaranty Agreement does not change this Court's "core" jurisdiction to adjudicate their claim. *See Cent. Vt. PSC v. Herbert*, 341 F.3d 186, 191 (2d Cir. 2003) ("Our cases have upheld bankruptcy jurisdiction in what would otherwise be non-core proceedings where the party opposing the finding of jurisdiction has filed a proof of claim. In doing so, we have relied on two theories: (1) the proof of claim transforms litigation into a core proceeding; and (2) by filing the proof of claim, the creditor consents to the bankruptcy court's broad equitable jurisdiction.") (citing *S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702, 706 (2d Cir. 1995) ("The [c]ity, by filing its proof of claim in this case, not only triggered 28 U.S.C. § 157(b)(2)(B), but also necessarily submitted to the court's equitable power to resolve its claims."); *Cibro Petroleum Prods. v. Albany (In re Winimo Realty Corp.)*, 270 B.R. 99, 102 & n.7 (Bankr. S.D.N.Y. 2001) (citing numerous cases in which filing proof of claim is a sufficient basis for finding the proceeding core); *Pan American World Airways, Inc. v. Evergreen Int'l Airlines*, 132 B.R. 4, 7 (Bankr. S.D.N.Y. 1991) ("When a creditor files a proof of claim it submits itself to the bankruptcy court's equitable power, and the claims, even though arising under state law, become core proceedings within the jurisdiction of the bankruptcy court.")). *See also Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1389-90 (2d Cir. 1990) (holding objection to claim proceeding fell within bankruptcy jurisdiction, even though claim was based on

9

to the Court's determination of whether that claim was proper since § 506(b) would only apply to an over-secured creditor's claim for attorneys' fees under the Guaranty Agreement.

CPW's challenge to Fortress's claim is premised instead upon the law applicable to the relevant agreements. The validity and amount of a claim is generally determined by applicable non-bankruptcy law. *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.,* 549 U.S. 443, 450 (2007). Under the Facility Agreement, pursuant to which Jonquille paid the attorneys' fees at issue, the applicable law is English law. (Facility Agmt., § 12, ¶¶ 37, 38.1.) English law also governs the disposition of the London Property under the Stipulation. (Stip., ¶ 14.) The attorneys' fees and costs referred to in the Stipulation, which grants the Debtors the ability to challenge the reasonableness of those fees, are fees associated with the disposition of the London Property and are thus subject to English Law. Were the Court to retain jurisdiction over the dispute, the Court would resolve that controversy in accordance with English law as provided by Fortress and Jonquille in the Facility Agreement, and by CPW and the remainder of the Parties in the Stipulation.

**Permissive Abstention**

Fortress argues if the Court has jurisdiction it should refrain from exercising jurisdiction over the attorneys' fees because the entries were (i) recorded under London billing standards, (ii) on a Loan to a London-based borrower that is not in bankruptcy before the Court and that is governed by English law, (iii) where the proceeds of the sale

---

pre-petition state law right, because party consented to jurisdiction by filing proof of claim). Moreover, 28 U.S.C. § 157(b)(3) provides, in relevant part, that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."

10

of the property were located in London, and (iv) where the borrower did not challenge the application of the proceeds under English law. (Fortress Response, ¶ 6.)

28 U.S.C. § 1334(c)(1) provides that a court may, "in the interest of comity or judicial economy," abstain from hearing a particular proceeding "related to" a case under title 11. This section "codifies the permissive abstention doctrine and demonstrates the intent of Congress that concerns of comity and judicial convenience should be met, not by rigid limitations on the jurisdiction of federal courts, but by the discretionary exercise of abstention when appropriate in a particular case." *In re Cody, Inc.*, 281 B.R. 182, 190 (Bankr. S.D.N.Y. 2002) (internal quotations and citations omitted).

There are twelve factors that bankruptcy courts consider when deciding whether to exercise their discretion to permissively abstain from hearing a controversy: (1) the effect of abstention, or lack thereof, on efficient administration of estate; (2) the extent to which state law issues predominate; (3) the difficult or unsettled nature of the applicable state law; (4) the presence of a related proceeding commenced in state court or another non-bankruptcy forum; (5) whether there is basis for federal jurisdiction apart from debtor's bankruptcy filing; (6) the degree of relatedness or remoteness of proceeding to main bankruptcy case; (7) the substance, rather than form, of asserted "core" proceeding; (8) the feasibility of severing state law claims; (9) the burden of the court's docket; (10) the likelihood that commencement of proceeding in bankruptcy court involves forum-shopping; (11) the existence of a right to jury trial; and (12) the presence in proceeding of non-debtor parties. *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 147 (Bankr. S.D.N.Y. 2010) (citing *In re Ephedra Prods. Liab. Litig.*, 2010 WL 882988, at *2 n. 2 (S.D.N.Y. 2010) (quoting *N.Y. City Employees' Ret. Sys. v. Ebbers (In re WorldCom,*

11

*Inc. Sec. Litig.)*, 293 B.R. 308 (Bankr. S.D.N.Y. 2003)); *In re Bozel S.A.,* 434 B.R. 86, 101-02 (Bankr. S.D.N.Y. 2010)). Bankruptcy courts consider one or more (although not necessarily all) of the above twelve factors. *In re Cody, Inc.*, 281 B.R. at 190.

While 28 U.S.C. § 1334(c)(1) refers to comity with "state courts" and with respect to "state law," several courts, including this Court, have extended 28 U.S.C. § 1334(c)(1) to foreign proceedings under the doctrine of international comity. *In re Bozel S.A.,* 434 B.R. at 102 (citing *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 832-33 (5th Cir. 1993); *In re Regus Business Centre Corp.,* 301 B.R. 122, 128-29 (Bankr. S.D.N.Y. 2003)). International comity is relevant in determining whether a court should decline to exercise jurisdiction. *Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.)*, 93 F.3d 1036, 1047 (2d Cir. 1996) (citing *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 797-99 & nn. 24-25 (1993)). The Court will thus consider several of the relevant factors in light of international comity considerations.

*A. Effect of abstention, or lack thereof, on efficient administration of estate*

The Court's abstention would not amount to abdication of any necessary role in the administration of the estate. A plan has already been confirmed[9] and the assets of the estate have already been liquidated pursuant to that plan. Accordingly, the Court finds that this factor weighs in favor of abstention.

*B. Extent to which English law issues predominate*

The Second Circuit in *In re Maxwell Communication Corp.*, 93 F.3d 1036 (2d Cir. 1996) considered an action brought by a debtor seeking to apply U.S. bankruptcy law to what the court found to be a predominately English transaction. In analyzing whether

---

[9] Order signed on December 16, 2009 confirming the first amended and restated plan of liquidation dated June 30, 2009, as modified by the post-confirmation modification dated November 16, 2009 (Doc. No. 150).

12

England or the U.S. had a closer connection to the preference dispute at issue, the court applied several "connecting factors" between the transaction and England, including where the transfers occurred. In *Maxwell*, the transfers were made to and from accounts maintained the U.K., with the exception of one transfer that was initially routed through one of the defendant's New York branch offices. The court found this to weigh in favor of abstention. *Id.* at 1051.

In the proceeding before this Court, the attorneys' fees at issue not only accrued in the U.K., but the money used to pay those fees was paid in the U.K. from English property. Pursuant to U.K. law, following completion of the sale of the London Property, Fortress applied the sale proceeds first towards the payment of fees and expenses of the foreclosure, including the attorneys' fees incurred by Fortress incident to the sale. Law of Property Act 1925, § 105. Unlike *Maxwell*, where one of the transfers went through the United States, here no part of the setoff took place outside of England.

The *Maxwell* court also noted that the transfers in that case resulted from negotiations that took place in England under the application of English law; this connection also weighed in favor of abstention. Here, the Facility Agreement between Fortress and Jonquille provides that the loan governed by English Law and that the courts of England have exclusive jurisdiction to settle disputes arising out of the agreement.[10] (Facility Agmt. § 12, ¶¶ 37, 38.1, respectively.) In contracting for England as the choice of law, the parties entered into the transaction with the reasonable expectation that their rights and obligations would be construed and enforced under English law. *See In re*

---

[10] Although the Guaranty Agreement between Fortress and CPW provides that New York law is the choice of law and that the Courts of New York have nonexclusive jurisdiction of the case (Guaranty Agmt., § 10(k)), the attorneys' fees incurred in this case were incurred in accordance with Fortress's rights under the Facility Agreement, not those under the Guaranty Agreement.

13

*Regus Business Centre Corp, et. al.,* 301 B.R. at 127 (declining to exercise jurisdiction over a challenge to attorneys' fees that were already set off in England pursuant to English law.) Given the close connection of the dispute to England, the English Courts have a greater interest in dealing with this matter and in interpreting and applying English costs law.

Accordingly, this factor also weighs in favor of abstention.

*C. Difficult or unsettled nature of the applicable law*

For the purposes of permissive abstention, the Court need not determine with certainty all points of English law. *In re Bozel S.A.*, 434 B.R. at 104. However, a threshold inquiry for determining issues of international comity is whether there exists an actual conflict between United States law and foreign law. *In re Maxwell Communication Corp.*, 93 F.3d at 1049 (citations omitted). Fortress urges the Court to apply U.K. standards of timekeeping which, they allege, are more lenient than the standards in the U.S. (Fortress Response, ¶ 40.) In response, CPW argues that the U.K. billing standards are at least as rigorous as those required by the Bankruptcy Code. (Fortress Reply, ¶ 13.) After a review of the billing standards attached as Exhibit "C,"[11]

---

[11] In their Amended and Restated Reply, CPW attached as Exhibit "C" Section 4 of the U.K. "Costs Practice Direction," which provides the form and contents of a bill of costs under English law. At the close of the hearing on November 19, 2010, counsel for Fortress objected to the admissibility of Exhibit "C." While counsel to Fortress did not enumerate a specific Rule of Evidence that would prevent CPW from including Exhibit C, it would appear that Fortress objects to both the applicability of the law as well as the manner of authenticating that law.

Under Federal Rule of Evidence 301, a party contending that a matter is governed by foreign law has the burden of proving the allegedly applicable principles of foreign law. *In re Griffin Trading Co., Inc.*, 399 B.R. 862, 865 (N.D. Ill. 2009) ("Although the Defendants argue that foreign law should be used, they have yet to identify what foreign law applies or explain how that law differs from forum law."). Further, foreign public documents may only be self-authenticated when reasonable opportunity has been given to the parties to investigate its authenticity and accuracy. Fed. R. Ev. § 902(3). This is generally established by declaration, affidavit, or testimony of an expert on that law. *Sphere v. Drake Ins. v. All Am. Life Ins. Co.*, 221 F.Supp.2d 874, 884 (N.D. Ill. 2003).

However, regardless of the exhibit's admissibility under the Federal Rules of Evidence, Federal Rule of Civil Procedure 44.1, made applicable through Federal Rule of Bankruptcy Procedure 9017, provides that

14

the Court has determined that the billing standards in the U.S. appear to be equal to or higher than the standards in the U.K.  Costs Practice Direction § 4.  *See also* Schedule of Costs Precedents Model Form of Bill of Costs, *available at* http://www.justice.gov.uk/ civil/procrules_fin/contents/practice_directions/pd_parts43-48.htm#IDASR0EC.

However, the issue arises as to which party has the burden of proving the reasonableness of the requested fees.  In the U.S., "the fee applicant bears the burden of proof on his claim for compensation."  *In re Brous,* 370 B.R. 563, 569 (Bankr. S.D.N.Y. 2007); *In re Scarlet Hotels, LLC,* 392 B.R. 698 (6th Cir. 2008) (finding that the fee applicant bears burden of proof under § 506(b)).  In contrast, in the U.K., there are two bases for the assessment of costs: the standard basis (the "Standard Basis") and the indemnity basis (the "Indemnity Basis").  C.P.R. 44.4(1).  Where the amount of costs is to be assessed on a Standard Basis, the court will resolve any doubt it may have as to whether the costs were reasonably incurred in favor of the paying party; where the amount of costs is to be assessed on an Indemnity Basis, the court will resolve any doubt which it may have in favor of the applicant.  C.P.R. 44.4(2), 44.4(3) (respectively).  With respect to which approach applies in a given case, "cases vary considerably and the Court of Appeal has declined to lay down guidelines on the subject."  *Digitel (St. Lucia) Ltd. v. Cable & Wireless Plc.,* [2010] EWHC 888 (Chancery Division).

---

when determining foreign law, so long as the party who intends to raise an issue of a foreign country's law provides notice, "the court may consider any relevant material or source . . . whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  Courts have considered the plain text of applicable foreign law in making rulings regarding foreign law.  *See, e.g., Abdelhamid v. Altria Group, Inc.,* 515 F. Supp. 2d 384, 396 (S.D.N.Y. 2007); 9A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2444 (3d ed. 2010) ("Statutes . . . can be established most easily by introducing a copy of the applicable provisions . . . .").

  Although it would have been preferable for CPW to have U.K. counsel submit an affidavit authenticating the document and explaining the billing standards, pursuant to Federal Rule of Civil Procedure 44.1 and Federal Rule of Bankruptcy Procedure 9017, Fortress's objection to Exhibit "C" is overruled.

Although the underlying contract can instruct the Court as to which basis applies, the Facility Agreement is silent as to whether costs are to be considered on a Standard or on an Indemnity Basis. Even if the Court were to presume the burden in the U.K. is the same as it is in the U.S.,[12] an English Court may come to a different determination as to the reasonableness of the fees than a U.S. court would. *In re Regus Business Centre Corp.*, 301 B.R. at 128. Because of the difficulty of applying English law, an English Court is better suited to determine whether the fees requested were reasonable. Accordingly, this factor weighs in favor of abstention.

*D. Presence of a related proceeding commenced in another non-bankruptcy forum*

Although there is no proceeding underway in the U.K., CPW has an adequate remedy under English law in an English forum.[13] Under the Civil Procedural Rules of the United Kingdom ("C.P.R."), if a mortgagor wishes to dispute such fees and expenses, it must file an application with the court and demonstrate that the fees were unreasonably incurred or are unreasonable in amount. C.P.R. 48.3. Absent such a challenge, unless the contract expressly provides otherwise, the costs are presumed to be reasonable. *Id.*; Directions Relating to C.P.R. Part 48, § 50.2 (explaining that C.P.R. 48.3 does not require the court to make an assessment of such costs nor does it require a mortgagee to challenge those costs.) If the Borrower desires to challenge those fees, it may do so in

---

[12] A preliminary review of English case law on the matter reveals that the Indemnity Basis would likely apply. *Gomba Holdings (UK) Ltd. v. Minories Finance Ltd. (No 2).,* [1993] Ch 171 (Court of Appeal). The Court in *Gomba* held that the clause "all costs, charges and expenses" was to be assessed on an Indemnity Basis. Here, the applicable enforcement clause provides that "all costs and expenses (including legal fees)" will be paid by the borrower. (Facility Agmt., ¶ 17.3.) If the Indemnity Basis does, in fact, apply, the burden of proof would be on CPW to challenge the fees in the U.K, and the Court will resolve any doubt which it may have as to whether costs were reasonably incurred in favor of Fortress. C.P.R. 44.4(3).

[13] It would appear that the statute of limitations has not yet run on an action to challenge attorneys' fees in the U.K. Since this Court would be bound to follow U.K. law, if, in fact, it did expire, the U.K. statute of limitations would apply with equal force before this Court.

16

the U.K.  Directions Relating to C.P.R. Part 48, § 50.4 (enabling the mortgagor to make an application for the court to direct that an account of the mortgagee's costs be taken where the contract entitles a mortgagee to require a mortgagor to cover those costs).

English law also provides that a third-party guarantor has standing to bring a challenge to attorneys' fees paid pursuant to C.P.R. 48.3.[14]  CPW covenanted that it would be liable to Fortress for all attorneys' fees and costs that Jonquille failed to pay. (Guaranty Agmt., § 7.)  CPW was thus secondarily liable for reasonable attorneys' fees incurred under the Facility Agreement and could have applied for an assessment of costs and requested a determination of unreasonableness from the appropriate U.K. court. C.P.R. 48.3.  *See Tim Martin Interiors Limited v. Akin Gump LLP*, [2010] EWHC 2951, ¶

---

[14] If this Court is incorrect regarding CPW's standing to challenge the attorneys' fees in the U.K., the Court would have to overrule the objection based upon CPW's inability to directly challenge the attorneys' fees related to the London Property.  The Court would arguably, however, have jurisdiction over any claim Jonquille brings for an assessment of attorneys' fees. 28 U.S.C. § 157(c)(1) and 28 U.S.C. § 1334(b) enable a bankruptcy judge to hear a proceeding that is not a "core" proceeding if it is otherwise "related to" a case under title 11.  Whether a matter is "related to" a pending bankruptcy case for the purposes of jurisdiction depends upon whether the outcome of that case might have any "conceivable effect" on the bankruptcy estate.  *Publicker Ind. Inc. v. U.S. (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992); *In re Pacor, Inc.*, 743 F.2d 984, 994 (3d Cir. 1984).  A "conceivable effect" is one which "could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  *In re New 118th LLC,* 396 B.R. 885, 890 (Bankr. S.D.N.Y. 2008) (citing *In re Pacor, Inc.*, 743 F.2d at 994).  A dispute that affects the distribution of assets of the estate "relates to" bankruptcy.  *Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746, 749 (7th Cir. 1989).

  The allowance of the attorneys' fees altered the amount of funds available for distribution to CPW's creditors because the application of the U.K. sale proceeds to the attorneys' fees reduced the amount remaining to pay the outstanding loan balance.  If Jonquille were to succeed in a challenge to Fortress's fees, "the total amounts due on claims against [CPW's] bankruptcy estate would be decreased." *Randall & Blake, Inc. v. Evan (In re Canion)*, 196 F.3d 579, 585-86 (5th Cir. 1999) (holding that judgment creditor's claim against the debtor's guarantors was "related to" the bankruptcy case).  Where an indemnification clause confers a right to recover from the debtor, "a judgment in the underlying suit will have a direct effect on the debtor's estate and, therefore, the underlying suit is related to the chapter 11 proceeding." *Weisman v. Southeast Hotel Properties Ltd. Partnership,* 1992 WL 131080 (Bankr. S.D.N.Y. 1992).  *See also Blackacre Bridge Capital LLC v. Korff (In re River Ctr. Holdings, LLC)*, 288 B.R. 59, 66 (Bankr. S.D.N.Y. 2003) (finding that a lawsuit between a creditor and a guarantor, where the guarantor's reimbursement claim against the estate included legal fees, had a "conceivable effect" on the estate).  Since the size of Fortress's deficiency claim against the estate depended upon what portion of the sale proceeds were used to offset the amount owed to Fortress, this Court would have "related to" jurisdiction over an action between Fortress and Jonquille for attorneys' fees.

  Nevertheless, even if a challenge by Jonquille to the payment of attorneys' fees were brought before this Court, the Court would likely decline to exercise jurisdiction under 28 U.S.C. § 1334(c)(1) for the reasons set forth, *infra*.

17

41 (Chancery Division) (finding that where a third party is liable for attorneys' fees under C.P.R. 48.3, that third party is entitled to an assessment of costs). Since an alternate, more appropriate forum exists in which CPW may bring its objection to the attorneys' fees, this factor weighs in favor of abstention.

*E. Degree of relatedness or remoteness of proceeding to main bankruptcy case*

The issues presented in the Motion arise out of the London Property and the attorneys' fees regarding that property and therefore concern property that is not part of the Debtors' estate. *Compare In re Chada*, 417 B.R. 186. 194 (Bankr. E.D.N.Y. 2009) ("[T]he issues presented by the Complaint and Counterclaims arise out of the [Debtors'] property and the rental income generated by that property, and therefore concern property of the Debtors' bankruptcy estate."). Accordingly, this factor also weighs in favor of abstention.

For the foregoing reasons, the Court finds that the relevant factors weigh in favor of this Court's exercising its discretion to abstain.

**Conclusion**

When Fortress filed a claim against the estate, it conferred "core" jurisdiction on this Court. Nevertheless, the Court also recognizes that in "certain international disputes the prudent and just action for a federal court is to abstain from the exercise of jurisdiction." *In re Regus Business Centre Corp.*, 301 B.R. at 128 (citing *Turner Entertainment Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir. 1994)). For the reasons stated herein, the Court concludes that it will exercise its discretion to abstain from deciding these objections under the permissive abstention doctrine of 28 U.S.C. § 1334(c)(1). Therefore, CPW's Motion Objecting to Compensation and Reimbursement

18

of Expenses Paid to Dewey & Lebouef LLP and Arnold & Porter LLP as Counsel to Fortress Credit Corp. is denied without prejudice for the Debtor to bring an appropriate claim consistent with this opinion.

Fortress should settle an order consistent with this opinion.

Dated: New York, New York
March 3, 2011

<u>s/Arthur J. Gonzalez</u>
ARTHUR J. GONZALEZ
CHIEF UNITED STATES BANKRUPTCY JUDGE